UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

WAYNE KENNETH AUGÉ, II,                                          No. 14-10443 t11

    Debtor.

## MEMORANDUM OPINION

    The chapter 7 trustee seeks approval of a settlement he reached with the estate's primary creditor. The proposed settlement allows the creditor's claim at $2,050,000 and contains broad mutual releases, including a release of all claims against the debtor personally. This latter term is important because an undetermined portion of the claim is nondischargeable. The debtor objected, arguing that he owes the creditor substantially less than $2,050,000. The Court has reviewed the settlement terms and the legal issues involved and finds that, given the somewhat unusual circumstances of this case, the settlement is reasonable and should be approved.

    I.    FACTS[1]

    For the purposes of ruling on the settlement motion, the Court finds:[2]

    Northern New Mexico Orthopaedic Center, Inc. ("NNMOC") is a New Mexico corporation formed in 1988 by the debtor, Dr. Wayne K. Augé. NNMOC provided medical services and was headquartered in Santa Fe, New Mexico. It is no longer operating.

---

[1] If any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa.
[2] Many of these findings are from Judge Raymond Ortiz's Findings and Conclusions (defined below). The Court has previously determined that the Findings and Conclusions are binding on Augé and this Court.

During the relevant time, NNMOC had four shareholders: Augé, Dr. Brent Bair, Dr. Steven Jones, and Dr. Sanford Schulhofer. Augé was the President and Treasurer of NNMOC until February 1, 2008, when Bair was elected President and Augé was elected Treasurer/Secretary.

All the shareholders signed employment agreements with NNMOC. They also signed shareholder agreements with each other and with NNMOC. Augé prepared the documents. Augé represented to Bair, Jones, and Schulhofer that their employment agreements were similar to his, except his agreement did not have a noncompete provision and could only be terminated for cause. In fact, Augé's employment agreement also had substantially better deferred compensation terms.

Augé was in charge of calculating the shareholder bonuses due under the employment agreements. Judge Ortiz found that Augé paid himself improper bonuses of $173,187.54,[3] between August 2007 and December 31, 2008, and $199,233.83 in 2009. Augé did not tell the other shareholders about the overpayments and made efforts to conceal them.

According to Judge Ortiz, Augé was overpaid $185,424.89 in 2010. It is not clear whether the overpayments were of the same character as those in 2007-2009.

In late 2009 or early 2010, Augé proposed to take a leave of absence and prepared a draft agreement. From the ensuing discussions Jones, Bair, and Schulhofer learned about Augé's enhanced deferred compensation package. The parties never came to terms on a leave of absence.

Augé resigned from NNMOC effective December 30, 2010. Bair, Jones, Schulhofer, and NNMOC sued Augé in New Mexico's First Judicial District Court on January 14, 2011, Case No. D-101-CV-2011-00192. They alleged that Augé engaged in fraud, breach of fiduciary duty, embezzlement, and other wrongful conduct.

---

[3] This figure is subject to readjustment as part of the Jones Remand, defined below.

Judge Ortiz tried the action in February, 2012. On March 14, 2012, he entered detailed Findings of Fact, Conclusions of Law and Judgment (the "Findings and Conclusions"). Judge Ortiz found, inter alia, that Augé defrauded Bair, Jones, and Schulhofer by concealing and misrepresenting his enhanced deferred compensation terms. Judge Ortiz entered a judgment against Augé and in favor of NNMOC for $600,757.81 in compensatory damages,[4] $1,000,000 in punitive damages; pre- and post-judgment interest at 15% on "all amounts awarded to Plaintiffs;" and attorney's fees and costs in an amount to be determined. Augé appealed the judgment.

On February 14, 2014, Augé filed this chapter 11 case. NNMOC brought a nondischargeability adversary proceeding three months later. On April 22, 2015, the Court entered a partial summary judgment in the adversary proceeding, ruling that $372,421.37 of the state court judgment was nondischargeable under § 523(a)(4) (embezzlement), including interest accruing at 15% from the date the state court complaint was filed. The Court found that fact issues prevented entry of summary judgment on the nondischargeable character of the remaining judgment amount.

Two other adversary proceedings remain pending: one filed by NNMOC for injunctive relief and to impose a constructive trust, and the other filed by the Trustee seeking to avoid NNMOC's liens pursuant to § 544.

On September 16, 2014, the New Mexico Court of Appeals affirmed the state court judgment, except that it remanded the compensatory damages award for recalculation. The remand relates to how NNMOC's accounting expert calculated the bonus money Jones was entitled to receive after he became a shareholder. From what the Court can tell, the expert may have included in his calculations revenue generated by Jones before he became a shareholder. Per the

---

[4] This figure is composed of a $527,821.49 negative balance under Augé's shareholder employment agreement and $72,936.32 in negative value of Augé's NNMOC shares.

employment agreement, such an inclusion would have been improper. Augé testified that, due to the slow-paying nature of Medicare, Medicaid, and private insurance, it takes months to collect billed fees. Thus, when the expert calculated the bonuses due to Jones, he might have used a revenue figure that was too high. The Court of Appeals determined there was not enough evidence to affirm Judge Ortiz's compensatory damage award in this respect:

> We affirm the district court's finding as to calculation of the damages in all respects except for the calculation and allocation of non-shareholder employee revenue generated by Jones before he became an NNMOC shareholder. We remand for recalculation of this amount.

(the "Jones Remand").

The New Mexico Supreme Court denied Augé's petition for certiorari.

The Court appointed a chapter 11 trustee on May 19, 2015, and converted the case to chapter 7 two months later. The chapter 11 trustee stayed on as the chapter 7 trustee. The estate will likely be solvent, especially if the settlement is approved.

NNMOC filed an amended proof of claim on August 19, 2015 for $3,386,864.37. The claim includes, inter alia, about $600,000 in post-petition attorney fees and 15% interest on all amounts, including fees and costs.

Since the petition date NNMOC has received three payments: $566,096 on March 20, 2015; $23,982 on or about April 3, 2015; and $500,000 on March 26, 2016. The first payment was available on June 26, 2014, but payment was delayed by NNMOC's (ultimately unsuccessful) challenge to Augé's homestead exemption.

The Trustee and NNMOC hired an experienced commercial mediator to mediate a settlement of their disputes. On April 21, 2016, after a full day of mediation, the parties arrived at a proposed settlement with the following terms:

- NNMOC's claim would be allowed at $2,050,000;

- $372,421.37 of that amount would bear interest at 15%; the balance would bear interest at .12%;
- All litigation between the Trustee and NNMOC in state court and bankruptcy court would be settled;
- Augé would not be able to pursue his objection to NNMOC's claim;
- Each party would bear its own attorney fees;
- The Trustee would release all estate claims against NNMOC, Jones, Bair, and Schulhoffer;
- NNMOC, Bair, Jones, and Schulhoffer would release all claims against the estate and Augé, other than NNMOC's allowed $2,050,000 claim.

If the settlement were not approved, Augé projects that NNMOC's allowed claim would be between $1,225,000 and $1,915,000, depending on the outcome of the Jones Remand. NNMOC projects its claim would be at least $2,900,000, with interest at 15% until paid.

## II. DISCUSSION

A. Standard for Approving a Rule 9019 Settlement.

A proposed settlement must be fair, equitable, and in the best interests of the estate. *In re Rich Global, LLC,* 2016 WL 3397685, at *5 (10th Cir. 2016); *In re American Reserve Corp.,* 841 F.2d 159, 161 (7th Cir.1987) (collecting cases). It need not represent the best possible outcome. *Tri–State Financial, LLC v. Lovald,* 525 F.3d 649, 654 (8th Cir. 2008). Rather, "the court need only determine that the settlement does not fall below the lowest point in the range of reasonableness." *Id. See also Rich Global,* 2016 WL 3397685, at *5; *In re Brutsche,* 500 B.R. 62, 71 (Bankr D.N.M. 2013). In assessing the reasonableness of the settlement, the court must consider: "(1) the probable success of the underlying litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; (4) and the interests of creditors in deference to their reasonable views." *In re Kopexa Realty Venture Co.,* 213 B.R. 1020, 1022 (10th Cir. BAP 1997); *In re Edwards,* 1992 WL 84354, *3 (10th Cir. 1992) (listing the same factors).

The decision to approve a settlement must be "an informed one based upon an objective evaluation of developed facts." *Reiss v. Hagmann,* 881 F.2d 890, 892 (10th Cir. 1989). However, the Court is not required to conduct a "mini-trial" on the issues, nor does it need to decide the disputed legal or factual questions. *Brutsche*, 500 B.R. at 71; *Rich Global, LLC,* 2016 WL 3397685, *5. If the outcome of litigation is uncertain, compromise may be an appropriate solution. *In re Endoscopy Center of Southern Nevada, LLC,* 451 B.R. 527, 551 (Bankr. D. Nev. 2011).

B. <u>Post-Petition Interest on NNMOC's Allowed Claim</u>.

One significant issue affecting NNMOC's claim amount is whether post-petition interest accrues at the federal rate (.12%) or the judgment rate (15%). The case has been pending for about two and a half years, so the higher rate would increase NNMOC's claim by at least $400,000.

Section 726(a)(5)[5] allows post-petition interest on unsecured claims in solvent bankruptcy cases. It provides, in relevant part:

> (a) Except as provided in section 510 of this title, property of the estate shall be distributed—
>
> (5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection;

A 1998 case from this district ruled that under § 726(a)(5), the term "the legal rate" means "the rates prescribed [in] any underlying agreements, contracts or judgments." *In re Carter*, 220 B.R. 411, 417 (Bankr. D.N.M. 1998). The holding was based in part on "the underlying policy of the Code to avoid producing a windfall for the debtor." *Id.* at 416-17.

This Court disagrees with *Carter's* holding. Many cases construe "the legal rate" as the federal judgment rate, not the state law contract or judgment rate. *See, e.g.*, *In re Dow Corning*

---

[5] All statutory references are to 11 U.S.C.

*Corp.*, 237 B.R. 380, 397 (Bankr. E.D. Mich. 1999) (criticizing *Carter's* analysis); *In re Madison 92nd St. Assoc. LLC,* 472 B.R. 189 (Bankr. S.D.N.Y. 2012) (federal judgment rate is recognized by most courts as "the legal rate of interest" within the meaning of § 726(a)(5)).[6] The reasons for this interpretation are well articulated in *Cardelucci*:

> 1. Using the definite article "the" instead of the indefinite article "a" indicates that Congress meant for a single source to be used to calculate postpetition interest;
> 2. Using the term "legal rate" indicates that Congress intended the source to be statutory, because the commonly understood meaning of "at the legal rate" is the rate fixed by federal statute;
> 3. Use of a single, federal rate promotes uniformity within federal law;
> 4. Holders of allowed claims are akin to holders of federal judgments, so using the federal judgment rate is proper;
> 5. The award of post-judgment interest is procedural in nature and thereby dictated by federal law;
> 6. Applying a single rate insures equitable treatment of creditors;
> 7. It is much easier to use a single rate, especially in cases with many creditors; and
> 8. Legislative history indicates that the term "interest at the legal rate" was chosen over the original "interest on claims allowed."

285 F.3d at 1234-36. The Court finds *Cardelucci* persuasive, and interprets § 726(a)(5) to mean interest at the federal judgment rate.

The Court acknowledges the Trustee faced significant risk on this issue. There is no controlling Tenth Circuit case, and *Carter* is the only local decision. The Court therefore took into account the risk litigating an issue that had been considered settled in this district for many years. *See, e.g., In re Matthews,* 2014 WL 1277874, *2 (Bankr. N.D. Ga.) (the Trustee should consider whether it would be prudent to eliminate the inherent risks … of litigation in an uncertain cause").

---

[6] *See also In re Coram Healthcare Corp.,* 315 B.R. 321, 346 (Bankr. D. Del. 2004); *In re Cardelucci,* 285 F.3d 1231, 1234-35 (9th Cir. 2002), *cert. denied,* 537 U.S. 1072 (2002); *In re Washington Mutual, Inc.,* 461 B.R. 200, 242 (Bankr. D. Del. 2011), vacated in part 461 B.R. 200 (Bankr. D. Del. 2011); *In re Melenyzer*, 143 B.R. 829, 833 (Bankr. W.D. Tex. 1992).

C. <u>Post-Petition Attorney Fees</u>.

Another big question is whether unsecured creditors can recover post-petition attorney fees, which could increase NNMOC's claim by about $600,000. *Carter* stated: "This Court has already found that interest is appropriately awarded to an unsecured creditor when there is a solvent debtor . . . The same is true regarding attorneys fees." 220 B.R. at 418. The *Carter* court made this ruling despite acknowledging that § 506(b)[7] did not apply because the creditor was unsecured. Again, the decision apparently was based on policy considerations rather than statutory interpretation.

The Court also parts company with *Carter* on this issue. There is a substantial debate among courts and commentators about whether unsecured creditors can recover post-petition attorney fees. Two thoughtful law review articles addressed the issue: Scarberry, *Interpreting Bankruptcy Code Sections 502 and 506: Post-Petition Attorneys' Fees in a Post-Travelers World*, 15 Am. Bankr. Inst. L. Rev. 611 (2007); and Taylor and Mertens, *Travelers and the Implications on the Allowability of Unsecured Creditors' Claims for Post-Petition Attorneys Fees Against the Bankruptcy Estate*, 81 Am. Bankr. L.J. 123 (2007). The major cases on the matter include *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007); *In re Tribune Media Co.*, 2015 WL 7307305, at *4 (Bankr. D. Del.); *In re Global Indus. Tech., Inc.,* 327 B.R. 230, 239 (Bankr. W.D. Pa. 2005); *In re SNTL Corp.,* 571 F.3d 826, 840 n. 16 (9th Cir. 2009); *In re Hedged-Investments Assoc., Inc.*, 293 B.R. 523 (Bankr. D. Colo. 2003); *In re Sakowitz*, 110 B.R. 268, 275 (Bankr. S.D. Tex. 1989); *In re Seda France, Inc.*, 2011 WL 3022563 (Bankr. W.D. Tex.); and *Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d 143 (2d Cir. 2009).

---

[7] Under that section, oversecured creditors are entitled to reasonable fees, costs, and charges provided for by contract or state statute.

Cases holding that unsecured creditors may recover post-petition attorney fees view the fees as contingent claims under § 101(5) and point to § 502(b) as allowing such claims. *Ogle*, 586 F.3d at 146; *SNTL Corp.,* 571 F.3d at 840. Other cases and commentators argue: (1) such an interpretation renders § 506(b) absurd or superfluous; (2) it is questionable whether post-petition attorney fees are really contingent claims; and (3) the specific provisions in §§ 502 and 506 addressing post-petition fees trump the general definition of "claim." *See, e.g., Seda France*, 2011 WL 3022563; *Global Indus. Tech.,* 327 B.R. at 239.

The better reading of the Code, in the Court's opinion, is that § 506(b) allows only *oversecured* creditors to add "reasonable fees, costs, or charges provided for under the agreement of State statute under which such claim arose." The debatable proposition that post-petition fees are "contingent" within the meaning of § 101(5)(A) cannot overshadow the clear meaning of §§ 502 and 506(b). This is particularly true since the Supreme Court found that § 506(b) has the substantive effect of denying undersecured creditors postpetition interest on their claims. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988).[8] The Court concludes NNMOC would not be entitled to its post-petition attorney fees, and omitted such fees in its projections on the claim amount.

As discussed above, the Trustee had no way of knowing that the Court would not follow *Carter* when he negotiated the settlement. Consequently, the Court considered the split in authority and the existence of *Carter* in evaluating the settlement's reasonableness.

---

[8] It is not clear NNMOC would be entitled to collect additional attorney fees in any event. The attorney fee provision in the shareholder employment agreement is limited. The corrected judgment does not explicitly provide for post-judgment attorney fees, and the New Mexico securities statute upon which NNMOC relies was not mentioned in the judgment.

E. <u>Nondischargeable Debts versus Payment of Allowed Claims</u>.

A third significant issue is the dischargeability of Augé's debt. NNMOC asserts that its entire judgment is nondischargeable under § 523(a)(2)(A). *See Cohen v. de la Cruz,* 523 U.S. 213 (1998) (interest, attorney fees, punitive damages stemming from a fraud claim are also nondischargeable). If NNMOC prevailed, its nondischargeable claim would easily exceed $2 million. The Court has already declared $372,421 of the compensatory damages nondischargeable, and would have to try the remaining issues if the settlement were not approved.

The nondischargeable character of the debt affects the post-petition interest rate. Even though NNMOC's allowed claim against the estate can be limited to the federal judgment rate, NNMOC likely would be entitled to collect post-petition interest at 15% against Augé personally. This is because "where a creditor holds a nondischargeable debt, the disallowed post-petition interest continues to accrue, and the creditor may collect the debt and post-petition interest after the debtor receives a discharge." *In re Graves*, 2016 WL 552676, at*2 (Bankr. D. Neb.); *In re Cohen*, 2011 WL 5509071, at *6 (Bankr. E.D.N.Y.) (post-petition interest on nondischargeable fraud judgment continued to accrue at the contract rate, to the extent not paid in bankruptcy); *In re Tuttle*, 291 F.3d 1238 (10th Cir. 2002) (post-petition interest on nondischargeable tax debt continues to accrue and remains an obligation of the debtor after entry of the discharge, if not paid by the estate); *In re Hanna*, 872 F.2d 829 (8th Cir. 1989) (same); *In re Kielisch*, 258 F.3d 315 (4th Cir. 2001) (post-petition interest on nondischargeable student loan debt continues to accrue). The settlement therefore is reasonable if a large portion of NNMOC's claim could be ruled nondischargeable.

-10-
Case 14-10443-t7    Doc 407    Filed 09/30/16    Entered 09/30/16 14:51:00 Page 10 of 16

F.   Other Disputed Issues Resolved by the Settlement.

If the settlement is not approved, a number of other matters would have to be litigated in this Court or state court, including:

1.   The Jones Remand.  On remand, it appears likely that the compensatory damages award would be reduced, perhaps by $75,303, which would reduce the nondischargeable portion of the judgment.  Augé argues that the actual reduction could be significantly more than $75,303, and wishes to conduct discovery and introduce additional evidence.[9]  Litigation of this issue could be time-consuming and expensive, and the outcome is uncertain.

2.   Rule 60(b)(6)/Malicious Abuse of Process.  Augé argues he recently discovered evidence sufficient to set aside the state court judgment, using a "fraud on the court" theory.  According to Augé, he discovered documents controverting Bair's trial testimony that he did not approve a certain bonus to Augé.  To prevail on the theory Augé would have to show: (1) the issue could be raised years later under Rule 60(b)(6) or a malicious abuse of process claim instead of 60(b)(2); (2) the newly discovered document is authentic (NNMOC disputes this); and/or (3) NNMOC's state court counsel concealed the evidence.  The Court is not persuaded the action would have much chance of success, or that the settlement should be rejected so Augé could pursue it.

3.   Augé's Standing.  Only the Trustee has standing to litigate the Jones Remand and the fraud on the court issues, and he does not want to abandon any claims to Augé.

4.   Additional Attorney Fees in State Court.  Many questions remain about what additional attorney fees, if any, NNMOC could collect in state court, including fees incurred

---

[9] The scope of the Jones Remand is subject to the state trial court's discretion, *Trujillo v. Sonic Drive–In/Merritt,* 924 P .2d 1371 (N.M. App. 1996), which adds to the uncertainty of the outcome.

in state court (litigating the appeal and the Jones Remand) and bankruptcy court (the nondischargeability action, claim objection, and other bankruptcy matters). Although the Bankruptcy Code does not provide a basis for post-petition fees, there is a chance NNMOC could get a sizeable additional attorney fee award from the state court.

      5. <u>Nondischargeability</u>. The amount of NNMOC's nondischargeable debt has yet to be determined. If it is less than the entire compensatory damage award, the Court would have to determine how to apportion punitive damages, attorney fees, and interest under *Cohen v. de la Cruz,* 523 U.S. 213 (1998). If the claim were only partially nondischargeable, questions also remain about whether payments to NNMOC must first be applied to any nondischargeable amounts.

      6. <u>Interest Accrual</u>. Difficult interest accrual questions would have to be litigated, including when interest started to accrue on each component of damages. In addition, there may be a question whether NNMOC is entitled to post-petition "interest on interest."

      7. <u>Application of Santa Fe House Proceeds</u>. NMMOC received a $566,096 partial payment on March 20, 2015, the net proceeds from the sale of Augé's Santa Fe house. The proceeds were available about nine months before; payment was delayed by NNMOC's objection to Augé's homestead exemption. The Court would have to determine whether interest accrual stopped when NNMOC actually received the funds or when they first became available.

      8. <u>Claim Objection</u>. Augé's claim objection would have to be tried; it is unclear whether the Jones Remand and/or the nondischargeability action should be part of the trial.

      9. <u>Venue</u>. The Court would have to determine whether the fraud on the court action, the Jones Remand, and NNMOC's entitlement to attorney fees should be tried in state court or this Court.

10. <u>Litigation Costs</u>. The litigation costs for the disputes outlined above are unknown. Based on the litigation history and contentious relationship between the parties, it likely would be several hundred thousand dollars.

11. <u>Delay</u>. Another unknown is how long it would take to finally determine the foregoing disputes and any other disputes not listed above. Including appeals, it could take several years, with interest accruing at 15% on at least some portion of NNMOC's claim.

G.     <u>Calculating a Reasonable Potential Outcome</u>.

If every penny of Augé's debt to NNMOC were dischargeable, the settlement may be too generous to NNMOC, given NNMOC's inability to collect post-petition attorney fees or interest at more than .12%. A rough calculation of NNMOC's allowed claim amount yields an allowed claim figure of about $1,450,000.

If the entire debt were nondischargeable, on the other hand, the settlement figure is quite reasonable. A similar calculation based on 100% nondischargeability yields a claim of at least $2,100,000, without taking into consideration any post-petition attorney fees the state court might award, or any interest that has accrued since April 21, 2016.

The Court could approve the settlement based on the ranges and risks identified above. Because each party has so much at stake, however, the Court ran its own calculations to satisfy itself that the settlement was fair. Except for the Jones Remand issue, the Court used most of the same assumptions as Augé, which reflects the Court's likely rulings if it were to liquidate the claim. The Court assumed that:

- The nondischargeable portion of the compensatory damages is $372,421;
- The Jones Remand yields a reduction of $75,303;
- This reduction reduces the nondischargeable portion to $297,118;
- Punitive damages and attorney fees are pro-rated between dischargeable and nondischargeable compensatory damages;
- The three partial payments are first applied to the nondischargeable debt;

-13-
Case 14-10443-t7    Doc 407    Filed 09/30/16    Entered 09/30/16 14:51:00 Page 13 of 16

- Pre-petition interest is 15%, starting on the state court filing date, except that interest did not start accruing on the $415,659 in attorney fees until December 7, 2015 (the date a specific amount was awarded);[10]
- Post-petition interest is .12% for the dischargeable portion and 15% for the nondischargeable portion;
- No post-petition attorney fees are awarded;
- NNMOC is deemed to have received the $566,096 partial payment on June 26, 2014 (when the funds were available); and
- All partial payments are applied first to interest, then to principal.

Using these assumption, NNMOC's claim amount is about $1,800,000 as of September 26, 2016. That's $250,000 less than the Trustee settled for. The $250,000 premium eliminates a great deal of uncertainty and expense, including:

- The risk that the nondischargeable portion of NNMOC's debt is higher than $297,118. Depending on the evidence at trial, it could be twice that;
- The risk that punitive damages are not pro-rated, but entirely traceable to the fraud;
- The risk that partial payments should be applied first to the dischargeable portion of the debt, or pro-rated among each different portion;
- The risk that NNMOC could recover additional attorney fees in state court;
- The risk that interest should accrue on the attorney fee award on the judgment date;
- The risk that the Santa Fe house proceeds should not been deemed applied until actually received;
- The risk that the Jones Remand would result in little or no reduction in compensatory damages;
- The accrual of interest at 15% on some portion of the debt until all litigation has been determined and the debt is paid in full; and
- The attorney fees the estate or Augé would have to pay to litigate the Jones Remand, the nondischargeability action, the claim objection, and the fraud on the court issue, including any appeals.

It is possible that Augé could do better than $1,800,000 if there were no settlement, particularly if he or the Trustee were permitted to offer new evidence that the Jones Remand reduces his liability by more than $75,303. On the other hand, Augé has substantial downside risk that NNMOC's claim could exceed the settlement amount, and that interest would continue to accrue while the

---

[10] The Court rejects Augé's argument that the attorney fee award should accrue interest at 8.75%, the New Mexico contract rate. In any event, it makes a difference of less than $10,000 based on the Court's other assumptions.

litigation dragged on for years. Overall, the Court is convinced that the settlement is a good deal for the estate and for Augé.

  H. Weighing the *Kopexa* Factors.

Based on the foregoing, the Court weighs the *Kopexa* factors as follows:

The probable success of the underlying litigation. In this context, "success" means reducing NNMOC's allowed claim. Aside from the $75,303 adjustment, Augé has not demonstrated he will succeed in disturbing NNMOC's state court judgment. The Court's own calculations project NNMOC's claim would be about $1,800,000, which is 12% less than the actual settlement amount. That 12% eliminates a lot of expense, delay, and uncertainty, and appears to be money well spent. This factor weighs in favor of the settlement.

The possible difficulty in collection of a judgment. Not applicable, or neutral.

The complexity and expense of the litigation. The dispute between Augé and NNMOC is complicated, having taken place in three different courts over five years. NNMOC has spent over $575,000 in the bankruptcy case alone. As debtor in possession Augé spent over $120,000[11] and is now spending his own money on litigation costs. Litigating the claims objection, the nondischargeability action, the Jones Remand and any appeals likely would cost the estate or Augé several hundred thousand dollars. This factor weighs strongly in favor of the settlement.

The interests of creditors in deference to their reasonable views. The bankruptcy case primarily is a dispute between NNMOC and Augé. NNMOC supports the settlement, unsurprising since it is one of the settling parties. The other creditors in the case, professionals, are divided (Augé's professionals oppose the settlement; the others support it). This factor is neutral.

The *Kopexa* factors weigh in favor of approving the settlement.

---

[11] See the fee application approval orders filed as docs. 308 and 309.

III. CONCLUSION

This is a tricky, complicated dispute, with myriad established facts, disputed facts, and legal issues. The Trustee did his best to assess the potential outcomes and risks and arrive at a reasonable settlement; the Court has done the same to review it. NNMOC and Augé made thoughtful, persuasive arguments in support of their respective positions. All counsel were well prepared and presented their arguments well. The Court has some sympathy for Augé's view that the state court judgment was unduly harsh. Nevertheless, given that the judgment has preclusive effect except for the Jones Remand, the Court concludes that the settlement is within the range of reasonableness and should be approved. A separate order will be entered.

                                                  Hon. David T. Thuma

Entered: September 30, 2016         United States Bankruptcy Judge

Copies to:

Daniel J. Behles
3800 Osuna Road NE, Ste. #2
Albuquerque, NM 87109

Julia B. Rose
P.O. Box 2503
Santa Fe, NM 87504

Daniel A. White
320 Gold Ave. SW, Ste. 300A
Albuquerque, NM 87102

Tom Walker
500 Marquette Ave. NW, #650
Albuquerque, NM 87102

Alice Lorenz
2501 Rio Grande Blvd. NW, Ste. A
Albuquerque, NM 87104